# CITY OF COLUMBIA ET AL. *v.* OMNI OUTDOOR ADVERTISING, INC.

No. 89–1671.   Argued November 28, 1990—Decided April 1, 1991

366

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, O'CONNOR, KENNEDY, and SOUTER, JJ., joined. STEVENS, J., filed a dissenting opinion, in which WHITE and MARSHALL, JJ., joined, *post*, p. 385.

*Joel I. Klein* argued the cause for petitioners. With him on the briefs were *Paul M. Smith, Roy D. Bates, James S. Meggs, David W. Robinson II,* and *Heyward E. McDonald.*

*A. Camden Lewis* argued the cause for respondent. With him on the brief was *Randall M. Chastain.** 

JUSTICE SCALIA delivered the opinion of the Court.

This case requires us to clarify the application of the Sherman Act to municipal governments and to the citizens who seek action from them.

I

Petitioner Columbia Outdoor Advertising, Inc. (COA), a South Carolina corporation, entered the billboard business in the city of Columbia, South Carolina (also a petitioner here), in the 1940's. By 1981 it controlled more than 95% of what has been conceded to be the relevant market. COA was a local business owned by a family with deep roots in the community, and enjoyed close relations with the city's political leaders. The mayor and other members of the city council were personal friends of COA's majority owner, and the company and its officers occasionally contributed funds and free billboard space to their campaigns. According to respondent Omni Outdoor Advertising, Inc., these beneficences were part of a "longstanding" "secret anticompetitive agreement" whereby "the City and COA would each use their *[sic]* respective power and resources to protect . . . COA's monopoly position," in return for which "City Council members received advantages made possible by COA's monopoly." Brief for Respondent 12, 16.

---

*Charles Rothfeld, Benna Ruth Solomon,* and *Peter J. Kalis* filed a brief for the National League of Cities et al. as *amici curiae* urging reversal.

*Steven C. McCracken, Maurice Baskin,* and *John R. Crews* filed a brief for Associated Builders and Contractors, Inc., as *amicus curiae* urging affirmance.

*Eric M. Rubin* and *Walter E. Diercks* filed a brief for the Outdoor Advertising Association of America, Inc., as *amicus curiae.*

In 1981, Omni, a Georgia corporation, began erecting billboards in and around the city. COA responded to this competition in several ways. First, it redoubled its own billboard construction efforts and modernized its existing stock. Second—according to Omni—it took a number of anticompetitive private actions, such as offering artificially low rates, spreading untrue and malicious rumors about Omni, and attempting to induce Omni's customers to break their contracts. Finally (and this is what gives rise to the issue we address today), COA executives met with city officials to seek the enactment of zoning ordinances that would restrict billboard construction. COA was not alone in urging this course; concerned about the city's recent explosion of billboards, a number of citizens, including writers of articles and editorials in local newspapers, advocated restrictions.

In the spring of 1982, the city council passed an ordinance requiring the council's approval for every billboard constructed in downtown Columbia. This was later amended to impose a 180-day moratorium on the construction of billboards throughout the city, except as specifically authorized by the council. A state court invalidated this ordinance on the ground that its conferral of unconstrained discretion upon the city council violated both the South Carolina and Federal Constitutions. The city then requested the State's regional planning authority to conduct a comprehensive analysis of the local billboard situation as a basis for developing a final, constitutionally valid, ordinance. In September 1982, after a series of public hearings and numerous meetings involving city officials, Omni, and COA (in all of which, according to Omni, positions contrary to COA's were not genuinely considered), the city council passed a new ordinance restricting the size, location, and spacing of billboards. These restrictions, particularly those on spacing, obviously benefited COA, which already had its billboards in place; they severely hindered Omni's ability to compete.

In November 1982, Omni filed suit against COA and the city in Federal District Court, charging that they had violated §§ 1 and 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. §§ 1, 2,[1] as well as South Carolina's Unfair Trade Practices Act, S. C. Code Ann. § 39–5–140 (1976). Omni contended, in particular, that the city's billboard ordinances were the result of an anticompetitive conspiracy between city officials and COA that stripped both parties of any immunity they might otherwise enjoy from the federal antitrust laws. In January 1986, after more than two weeks of trial, a jury returned general verdicts against the city and COA on both the federal and state claims. It awarded damages, before trebling, of $600,000 on the § 1 Sherman Act claim, and $400,000 on the § 2 claim.[2] The jury also answered two special interrogatories, finding specifically that the city and COA had conspired both to restrain trade and to monopolize the market. Petitioners moved for judgment notwithstanding the verdict, contending among other

---

[1] Section 1 provides in pertinent part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U. S. C. § 1.

Section 2 provides in pertinent part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U. S. C. § 2.

[2] The monetary damages in this case were assessed entirely against COA, the District Court having ruled that the city was immunized by the Local Government Antitrust Act of 1984, 98 Stat. 2750, as amended, 15 U. S. C. §§ 34–36, which exempts local governments from paying damages for violations of the federal antitrust laws. Although enacted in 1984, after the events at issue in this case, the Act specifically provides that it may be applied retroactively if "the defendant establishes and the court determines, in light of all the circumstances . . . that it would be inequitable not to apply this subsection to a pending case." 15 U. S. C. § 35(b). The District Court determined that it would be, and the Court of Appeals refused to disturb that judgment. Respondent has not challenged that determination in this Court, and we express no view on the matter.

things that their activities were outside the scope of the federal antitrust laws. In November 1988, the District Court granted the motion.

A divided panel of the United States Court of Appeals for the Fourth Circuit reversed the judgment of the District Court and reinstated the jury verdict on all counts. 891 F. 2d 1127 (1989). We granted certiorari, 496 U. S. 935 (1990).

## II

In the landmark case of *Parker* v. *Brown*, 317 U. S. 341 (1943), we rejected the contention that a program restricting the marketing of privately produced raisins, adopted pursuant to California's Agricultural Prorate Act, violated the Sherman Act. Relying on principles of federalism and state sovereignty, we held that the Sherman Act did not apply to anticompetitive restraints imposed by the States "as an act of government." *Id.*, at 352.

Since *Parker* emphasized the role of sovereign *States* in a federal system, it was initially unclear whether the governmental actions of political subdivisions enjoyed similar protection. In recent years, we have held that *Parker* immunity does not apply directly to local governments, see *Hallie* v. *Eau Claire*, 471 U. S. 34, 38 (1985); *Community Communications Co.* v. *Boulder*, 455 U. S. 40, 50–51 (1982); *Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389, 412–413 (1978) (plurality opinion). We have recognized, however, that a municipality's restriction of competition may sometimes be an authorized implementation of state policy, and have accorded *Parker* immunity where that is the case.

The South Carolina statutes under which the city acted in the present case authorize municipalities to regulate the use of land and the construction of buildings and other structures within their boundaries.[3] It is undisputed that, as a matter

---

[3] S. C. Code Ann. § 5–23–10 (1976) ("Building and zoning regulations authorized") provides that "[f]or the purpose of promoting health, safety, morals or the general welfare of the community, the legislative body of cit-

of state law, these statutes authorize the city to regulate the size, location, and spacing of billboards. It could be argued, however, that a municipality acts beyond its delegated authority, for *Parker* purposes, whenever the nature of its regulation is substantively or even procedurally defective. On such an analysis it could be contended, for example, that the city's regulation in the present case was not "authorized" by S. C. Code Ann. § 5–23–10 (1976), see n. 3, *supra*, if it was not, as that statute requires, adopted "for the purpose of promoting health, safety, morals or the general welfare of the community." As scholarly commentary has noted, such an expansive interpretation of the *Parker*-defense authorization requirement would have unacceptable consequences.

> "To be sure, state law 'authorizes' only agency decisions that are substantively and procedurally correct. Errors of fact, law, or judgment by the agency are not 'authorized.' Erroneous acts or decisions are subject to

ies and incorporated towns may by ordinance regulate and restrict the height, number of stories and size of buildings and other structures."

Section 5–23–20 ("Division of municipality into districts") provides that "[f]or any or all of such purposes the local legislative body may divide the municipality into districts of such number, shape and area as may be deemed best suited to carry out the purposes of this article. Within such districts it may regulate and restrict the erection, construction, reconstruction, alteration, repair or use of buildings, structures or land."

Section 6–7–710 ("Grant of power for zoning") provides that "[f]or the purposes of guiding development in accordance with existing and future needs and in order to protect, promote and improve the public health, safety, morals, convenience, order, appearance, prosperity, and general welfare, the governing authorities of municipalities and counties may, in accordance with the conditions and procedures specified in this chapter, regulate the location, height, bulk, number of stories and size of buildings and other structures. . . . The regulations shall . . . be designed to lessen congestion in the streets; to secure safety from fire, panic, and other dangers, to promote the public health and the general welfare, to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to protect scenic areas; to facilitate the adequate provision of transportation, water, sewage, schools, parks, and other public requirements."

reversal by superior tribunals because unauthorized. If the antitrust court demands unqualified 'authority' in this sense, it inevitably becomes the standard reviewer not only of federal agency activity but also of state and local activity whenever it is alleged that the governmental body, though possessing the power to engage in the challenged conduct, has actually exercised its power in a manner not authorized by state law. We should not lightly assume that *Lafayette*'s authorization requirement dictates transformation of state administrative review into a federal antitrust job. Yet that would be the consequence of making antitrust liability depend on an undiscriminating and mechanical demand for 'authority' in the full administrative law sense." P. Areeda & H. Hovenkamp, Antitrust Law ¶212.3b, p. 145 (Supp. 1989).

We agree with that assessment, and believe that in order to prevent *Parker* from undermining the very interests of federalism it is designed to protect, it is necessary to adopt a concept of authority broader than what is applied to determine the legality of the municipality's action under state law. We have adopted an approach that is similar in principle, though not necessarily in precise application, elsewhere. See *Stump* v. *Sparkman*, 435 U. S. 349 (1978). It suffices for the present to conclude that here no more is needed to establish, for *Parker* purposes, the city's authority to regulate than its unquestioned zoning power over the size, location, and spacing of billboards.

Besides authority to regulate, however, the *Parker* defense also requires authority to suppress competition—more specifically, "clear articulation of a state policy to authorize anticompetitive conduct" by the municipality in connection with its regulation. *Hallie*, 471 U. S., at 40 (internal quotation omitted). We have rejected the contention that this requirement can be met only if the delegating statute explicitly permits the displacement of competition, see *id.*, at 41–42.

It is enough, we have held, if suppression of competition is the "foreseeable result" of what the statute authorizes, *id.*, at 42. That condition is amply met here. The very purpose of zoning regulation is to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition, particularly on the part of new entrants. A municipal ordinance restricting the size, location, and spacing of billboards (surely a common form of zoning) necessarily protects existing billboards against some competition from newcomers.[4]

---

[4] The dissent contends that, in order successfully to delegate its *Parker* immunity to a municipality, a State must expressly authorize the municipality to engage (1) in specifically "economic regulation," *post*, at 388, (2) of a specific industry, *post*, at 391. These dual specificities are without support in our precedents, for the good reason that they defy rational implementation.

If, by authority to engage in specifically "economic" regulation, the dissent means authority specifically to regulate competition, we squarely rejected that in *Hallie* v. *Eau Claire*, 471 U. S. 34 (1985), as discussed in text. Seemingly, however, the dissent means only that the state authorization must specify that sort of regulation whereunder "decisions about prices and output are made not by individual firms, but rather by a public body." *Post*, at 387. But why is not the restriction of billboards in a city a restriction on the "output" of the local billboard industry? It assuredly *is*—and that is indeed the very gravamen of Omni's complaint. It seems to us that the dissent's concession that "it is often difficult to differentiate economic regulation from municipal regulation of health, safety, and welfare," *post*, at 393, is a gross understatement. Loose talk about a "regulated industry" may suffice for what the dissent calls "antitrust parlance," *post*, at 387, but it is not a definition upon which the criminal liability of public officials ought to depend.

Under the dissent's second requirement for a valid delegation of *Parker* immunity—that the authorization to regulate pertain to a specific industry—the problem with the South Carolina statute is that it used the generic term "structures," instead of conferring its regulatory authority industry-by-industry (presumably "billboards," "movie houses," "mobile homes," "TV antennas," and every other conceivable object of zoning regulation that can be the subject of a relevant "market" for purposes of antitrust analysis). To describe this is to refute it. Our precedents not only fail to suggest, but positively reject, such an approach. "[T]he municipal-

The Court of Appeals was therefore correct in its conclusion that the city's restriction of billboard construction was prima facie entitled to *Parker* immunity. The Court of Appeals upheld the jury verdict, however, by invoking a "conspiracy" exception to *Parker* that has been recognized by several Courts of Appeals. See, *e. g., Whitworth* v. *Perkins*, 559 F. 2d 378 (CA5 1977), vacated, 435 U. S. 992, aff'd on rehearing, 576 F. 2d 696 (1978), cert. denied, 440 U. S. 911 (1979). That exception is thought to be supported by two of our statements in *Parker:* "[W]e have no question of the state or its municipality becoming a *participant in a private agreement* or combination by others for restraint of trade, cf. *Union Pacific R. Co.* v. *United States*, 313 U. S. 450." *Parker*, 317 U. S., at 351–352 (emphasis added). "The state in adopting and enforcing the prorate program made no contract or agreement *and entered into no conspiracy in restraint of trade or to establish monopoly* but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." *Id.*, at 352 (emphasis added). *Parker* does not apply, according to the Fourth Circuit, "where politicians or political entities are involved as conspirators" with private actors in the restraint of trade. 891 F. 2d, at 1134.

There is no such conspiracy exception. The rationale of *Parker* was that, in light of our national commitment to federalism, the general language of the Sherman Act should not be interpreted to prohibit anticompetitive actions by the States in their governmental capacities as sovereign regulators. The sentences from the opinion quoted above simply clarify that this immunity does not necessarily obtain where the State acts not in a regulatory capacity but as a commer-

---

ity need not 'be able to point to a specific, detailed legislative authorization' in order to assert a successful *Parker* defense to an antitrust suit." *Hallie*, *supra*, at 39 (quoting *Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389, 415 (1978)).

cial participant in a given market. That is evident from the citation of *Union Pacific R. Co.* v. *United States*, 313 U. S. 450 (1941), which held unlawful under the Elkins Act certain rebates and concessions made by Kansas City, Kansas, in its capacity as the owner and operator of a wholesale produce market that was integrated with railroad facilities. These sentences should not be read to suggest the general proposition that even governmental *regulatory* action may be deemed private—and therefore subject to antitrust liability—when it is taken pursuant to a conspiracy with private parties. The impracticality of such a principle is evident if, for purposes of the exception, "conspiracy" means nothing more than an agreement to impose the regulation in question. Since it is both inevitable and desirable that public officials often agree to do what one or another group of private citizens urges upon them, such an exception would virtually swallow up the *Parker* rule: All anticompetitive regulation would be vulnerable to a "conspiracy" charge. See Areeda & Hovenkamp, *supra*, ¶203.3b, at 34, and n. 1; Elhauge, The Scope of Antitrust Process, 104 Harv. L. Rev. 667, 704–705 (1991).[5]

---

[5] The dissent is confident that a jury composed of citizens of the vicinage will be able to tell the difference between "independent municipal action and action taken for the sole purpose of carrying out an anticompetitive agreement for the private party." *Post*, at 395–396. No doubt. But those are merely the polar extremes, which like the geographic poles will rarely be seen by jurors of the vicinage. Ordinarily the allegation will merely be (and the dissent says this is enough) that the municipal action was not prompted "*exclusively* by a concern for the general public interest," *post*, at 387 (emphasis added). Thus, the real question is whether a jury can tell the difference—whether *Solomon* can tell the difference—between municipal-action-not-entirely-independent-because-based-partly-on-agreement-with-private-parties that is *lawful* and municipal-action-not-entirely-independent-because-based-partly-on-agreement-with-private-parties that is *unlawful*. The dissent does not tell us how to put this question coherently, much less how to answer it intelligently. "*Independent* municipal action" is unobjectionable, "action taken for the *sole* purpose of carrying out

Omni suggests, however, that "conspiracy" might be limited to instances of governmental "corruption," defined variously as "abandonment of public responsibilities to private interests," Brief for Respondent 42, "corrupt or bad faith decisions," *id.*, at 44, and "selfish or corrupt motives," *ibid.* Ultimately, Omni asks us not to define "corruption" at all, but simply to leave that task to the jury: "[a]t bottom, however, it was within the jury's province to determine what constituted corruption of the governmental process in their community." *Id.*, at 43. Omni's *amicus* eschews this emphasis on "corruption," instead urging us to define the conspiracy exception as encompassing any governmental act "not in the public interest." Brief for Associated Builders and Contractors, Inc., as *Amicus Curiae* 5.

---

an anticompetitive agreement for the private party" is unlawful, and everything else (that is, the known world between the two poles) is unaddressed.

The dissent contends, moreover, that "[t]he instructions in this case, fairly read, told the jury that the plaintiff should not prevail *unless* the ordinance was enacted for the sole purpose of interfering with access to the market." *Post*, at 396, n. 9 (emphasis added). That is not so. The sum and substance of the jury's instructions here were that anticompetitive municipal action is not lawful when taken as part of a conspiracy, and that a conspiracy is "an agreement between two or more persons to violate the law, or to accomplish an otherwise lawful result in an unlawful manner." App. 79. Although the District Court explained that "[i]t is perfectly lawful for any and all persons to petition their government," the court immediately added, "but they may not do so as a part or as the object of a conspiracy." *Ibid.* These instructions, then, are entirely circular: An anticompetitive agreement becomes unlawful if it is part of a conspiracy, and a conspiracy is an agreement to do something unlawful. The District Court's observation, upon which the dissent places so much weight, that "if by the evidence you find that [COA] procured and brought about the passage of ordinances solely for the purpose of hindering, delaying or otherwise interfering with the access of [Omni] to the marketing area involved in this case . . . and thereby conspired, then, of course, their conduct would not be excused under the antitrust laws," *id.*, at 81, see *post*, at 387, n. 2, is in no way tantamount to an instruction that this was the *only* theory upon which the jury could find an immunity-destroying "conspiracy."

A conspiracy exception narrowed along such vague lines is similarly impractical. Few governmental actions are immune from the charge that they are "not in the public interest" or in some sense "corrupt." The California marketing scheme at issue in *Parker* itself, for example, can readily be viewed as the result of a "conspiracy" to put the "private" interest of the State's raisin growers above the "public" interest of the State's consumers. The fact is that virtually all regulation benefits some segments of the society and harms others; and that it is not universally considered contrary to the public good if the net economic loss to the losers exceeds the net economic gain to the winners. *Parker* was not written in ignorance of the reality that determination of "the public interest" in the manifold areas of government regulation entails not merely economic and mathematical analysis but value judgment, and it was not meant to shift that judgment from elected officials to judges and juries. If the city of Columbia's decision to regulate what one local newspaper called "billboard jungles," Columbia Record, May 21, 1982, p. 14–A, col. 1; App. in No. 88–1388 (CA4), p. 3743, is made subject to *ex post facto* judicial assessment of "the public interest," with personal liability of city officials a possible consequence, we will have gone far to "compromise the States' ability to regulate their domestic commerce," *Southern Motor Carriers Rate Conference, Inc.* v. *United States*, 471 U. S. 48, 56 (1985). The situation would not be better, but arguably even worse, if the courts were to apply a subjective test: not whether the action was in the public interest, but whether the officials involved thought it to be so. This would require the sort of deconstruction of the governmental process and probing of the official "intent" that we have consistently sought to avoid.[6] "[W]here the action complained

---

[6] We have proceeded otherwise only in the "very limited and well-defined class of cases where the very nature of the constitutional question requires [this] inquiry." *United States* v. *O'Brien*, 391 U. S. 367, 383, n. 30 (1968) (bill of attainder). See also *Arlington Heights* v. *Metro-*

of . . . was that of the State itself, the action is exempt from antitrust liability regardless of the State's motives in taking the action." *Hoover* v. *Ronwin*, 466 U. S. 558, 579–580 (1984). See also *Llewellyn* v. *Crothers*, 765 F. 2d 769, 774 (CA9 1985) (Kennedy, J.).

The foregoing approach to establishing a "conspiracy" exception at least seeks (however impractically) to draw the line of impermissible action in a manner relevant to the purposes of the Sherman Act and of *Parker:* prohibiting the restriction of competition for private gain but permitting the restriction of competition in the public interest. Another approach is possible, which has the virtue of practicality but the vice of being unrelated to those purposes. That is the approach which would consider *Parker* inapplicable only if, in connection with the governmental action in question, bribery or some other violation of state or federal law has been established. Such unlawful activity has no necessary relationship to whether the governmental action is in the public interest. A mayor is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid. (That is frequently the defense asserted to a criminal bribery charge—and though it is never valid in law, see, *e. g.*, *United States* v. *Jannotti*, 673 F. 2d 578, 601 (CA3) (en banc), cert. denied, 457 U. S. 1106 (1982), it is often plausible in fact.) When, moreover, the regulatory body is not a single individual but a state legislature or city council, there is even less reason to believe that violation of the law (by bribing a minority of the decisionmakers) establishes that the regulation has no valid public purpose. Cf. *Fletcher* v. *Peck*, 6 Cranch 87, 130 (1810). To use unlawful political influence as the test of legality of state regulation undoubtedly vindicates (in a rather blunt way) principles of good government. But the statute we are construing is not directed to that end. Congress has passed other laws aimed

---

*politan Housing Development Corp.*, 429 U. S. 252, 268, n. 18 (1977) (race-based motivation).

at combating corruption in state and local governments. See, *e. g.*, 18 U. S. C. § 1951 (Hobbs Act). "Insofar as [the Sherman Act] sets up a code of ethics at all, it is a code that condemns trade restraints, not political activity." *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.*, 365 U. S. 127, 140 (1961).

For these reasons, we reaffirm our rejection of any interpretation of the Sherman Act that would allow plaintiffs to look behind the actions of state sovereigns to base their claims on "perceived conspiracies to restrain trade," *Hoover*, 466 U. S., at 580. We reiterate that, with the possible market participant exception, *any* action that qualifies as state action is *"ipso facto . . .* exempt from the operation of the antitrust laws," *id.*, at 568. This does not mean, of course, that the States may exempt *private* action from the scope of the Sherman Act; we in no way qualify the well-established principle that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." *Parker*, 317 U. S., at 351 (citing *Northern Securities Co.* v. *United States*, 193 U. S. 197, 332, 344–347 (1904)). See also *Schwegmann Brothers* v. *Calvert Distillers Corp.*, 341 U. S. 384 (1951).

## III

While *Parker* recognized the States' freedom to engage in anticompetitive regulation, it did not purport to immunize from antitrust liability the private parties who urge them to engage in anticompetitive regulation. However, it is obviously peculiar in a democracy, and perhaps in derogation of the constitutional right "to petition the Government for a redress of grievances," U. S. Const., Amdt. 1, to establish a category of lawful state action that citizens are not permitted to urge. Thus, beginning with *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc., supra*, we have developed a corollary to *Parker:* The federal antitrust laws also do not regulate the conduct of private individuals in seeking

anticompetitive action from the government. This doctrine, like *Parker*, rests ultimately upon a recognition that the antitrust laws, "tailored as they are for the business world, are not at all appropriate for application in the political arena." *Noerr, supra,* at 141. That a private party's political motives are selfish is irrelevant: *"Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Mine Workers* v. *Pennington,* 381 U. S. 657, 670 (1965).

*Noerr* recognized, however, what has come to be known as the "sham" exception to its rule: "There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." 365 U. S., at 144. The Court of Appeals concluded that the jury in this case could have found that COA's activities on behalf of the restrictive billboard ordinances fell within this exception. In our view that was error.

The "sham" exception to *Noerr* encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon. A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay. See *California Motor Transport Co.* v. *Trucking Unlimited,* 404 U. S. 508 (1972). A "sham" situation involves a defendant whose activities are "not genuinely aimed at procuring favorable government action" at all, *Allied Tube & Conduit Corp.* v. *Indian Head, Inc.,* 486 U. S. 496, 500, n. 4 (1988), not one "who 'genuinely seeks to achieve his governmental result, but does so *through improper means,' "* *id.,* at 508, n. 10 (quoting *Sessions Tank Liners, Inc.* v. *Joor Mfg., Inc.,* 827 F. 2d 458, 465, n. 5 (CA9 1987)).

Neither of the Court of Appeals' theories for application of the "sham" exception to the facts of the present case is sound. The court reasoned, first, that the jury could have concluded that COA's interaction with city officials "'was actually nothing more than an attempt to interfere directly with the business relations [sic] of a competitor.'" 891 F. 2d, at 1139 (quoting *Noerr, supra,* at 144). This analysis relies upon language from *Noerr,* but ignores the import of the critical word "directly." Although COA indisputably set out to disrupt Omni's business relationships, it sought to do so not through the very process of lobbying, or of causing the city council to consider zoning measures, but rather through the ultimate *product* of that lobbying and consideration, viz., the zoning ordinances. The Court of Appeals' second theory was that the jury could have found "that COA's purposes were to delay Omni's entry into the market and even to deny it a meaningful access to the appropriate city administrative and legislative fora." 891 F. 2d, at 1139. But the purpose of delaying a competitor's entry into the market does not render lobbying activity a "sham," unless (as no evidence suggested was true here) the delay is sought to be achieved only by the lobbying process itself, and not by the governmental action that the lobbying seeks. "If *Noerr* teaches anything it is that an intent to restrain trade as a *result* of the government action sought . . . does not foreclose protection." Sullivan, Developments in the Noerr Doctrine, 56 Antitrust L. J. 361, 362 (1987). As for "deny[ing] . . . meaningful access to the appropriate city administrative and legislative fora," that may render the manner of lobbying improper or even unlawful, but does not necessarily render it a "sham." We did hold in *California Motor Transport, supra,* that a conspiracy among private parties to monopolize trade by excluding a competitor from participation in the regulatory process did not enjoy *Noerr* protection. But *California Motor Transport* involved a context in which the conspirators' participation in the governmental process was itself claimed to be a

"sham," employed as a means of imposing cost and delay. ("It is alleged that petitioners 'instituted the proceedings and actions . . . with or without probable cause, and regardless of the merits of the cases.'" 404 U. S., at 512.) The holding of the case is limited to that situation. To extend it to a context in which the regulatory process is being invoked genuinely, and not in a "sham" fashion, would produce precisely that conversion of antitrust law into regulation of the political process that we have sought to avoid. Any lobbyist or applicant, in addition to getting himself heard, seeks by procedural and other means to get his opponent ignored. Policing the legitimate boundaries of such defensive strategies, when they are conducted in the context of a genuine attempt to influence governmental action, is not the role of the Sherman Act. In the present case, of course, any denial to Omni of "meaningful access to the appropriate city administrative and legislative fora" was achieved by COA in the course of an attempt to influence governmental action that, far from being a "sham," was if anything more in earnest than it should have been. If the denial was wrongful there may be other remedies, but as for the Sherman Act, the *Noerr* exemption applies.

Omni urges that if, as we have concluded, the "sham" exception is inapplicable, we should use this case to recognize another exception to *Noerr* immunity—a "conspiracy" exception, which would apply when government officials conspire with a private party to employ government action as a means of stifling competition. We have left open the possibility of such an exception, see, *e. g., Allied Tube, supra,* at 502, n. 7, as have a number of Courts of Appeals. See, *e. g., Oberndorf* v. *Denver,* 900 F. 2d 1434, 1440 (CA10 1990); *First American Title Co. of South Dakota* v. *South Dakota Land Title Assn.,* 714 F. 2d 1439, 1446, n. 6 (CA8 1983), cert. denied, 464 U. S. 1042 (1984). At least one Court of Appeals has affirmed the existence of such an exception in dicta, see *Duke & Co.* v. *Foerster,* 521 F. 2d 1277, 1282 (CA3 1975), and

the Fifth Circuit has adopted it as holding, see *Affiliated Capital Corp.* v. *Houston*, 735 F. 2d 1555, 1566–1568 (1984) (en banc).

Giving full consideration to this matter for the first time, we conclude that a "conspiracy" exception to *Noerr* must be rejected. We need not describe our reasons at length, since they are largely the same as those set forth in Part II above for rejecting a "conspiracy" exception to *Parker*. As we have described, *Parker* and *Noerr* are complementary expressions of the principle that the antitrust laws regulate business, not politics; the former decision protects the States' acts of governing, and the latter the citizens' participation in government. Insofar as the identification of an immunity-destroying "conspiracy" is concerned, *Parker* and *Noerr* generally present two faces of the same coin. The *Noerr*-invalidating conspiracy alleged here is just the *Parker*-invalidating conspiracy viewed from the standpoint of the private-sector participants rather than the governmental participants. The same factors which, as we have described above, make it impracticable or beyond the purpose of the antitrust laws to identify and invalidate lawmaking that has been infected by selfishly motivated agreement with private interests likewise make it impracticable or beyond that scope to identify and invalidate lobbying that has produced selfishly motivated agreement with public officials. "It would be unlikely that any effort to influence legislative action could succeed unless one or more members of the legislative body became . . . 'co-conspirators'" in *some* sense with the private party urging such action, *Metro Cable Co.* v. *CATV of Rockford, Inc.*, 516 F. 2d 220, 230 (CA7 1975). And if the invalidating "conspiracy" is limited to one that involves some element of unlawfulness (beyond mere anticompetitive motivation), the invalidation would have nothing to do with the policies of the antitrust laws. In *Noerr* itself, where the private party "deliberately deceived the public and public officials" in its successful lobbying campaign, we said that

"deception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned." 365 U. S., at 145.

## IV

Under *Parker* and *Noerr*, therefore, both the city and COA are entitled to immunity from the federal antitrust laws for their activities relating to enactment of the ordinances. This determination does not entirely resolve the dispute before us, since other activities are at issue in the case with respect to COA. Omni asserts that COA engaged in private anticompetitive actions such as trade libel, the setting of artificially low rates, and inducement to breach of contract. Thus, although the jury's general verdict against COA cannot be permitted to stand (since it was based on instructions that erroneously permitted liability for seeking the ordinances, see *Sunkist Growers, Inc.* v. *Winckler & Smith Citrus Products Co.*, 370 U. S. 19, 29–30 (1962)), if the evidence was sufficient to sustain a verdict on the basis of these other actions alone, and if this theory of liability has been properly preserved, Omni would be entitled to a new trial.

There also remains to be considered the effect of our judgment upon Omni's claim against COA under the South Carolina Unfair Trade Practices Act. The District Court granted judgment notwithstanding the verdict on this claim as well as the Sherman Act claims; the Court of Appeals reversed on the ground that "a finding of conspiracy to restrain competition is tantamount to a finding" that the South Carolina law had been violated, 891 F. 2d, at 1143. Given our reversal of the "conspiracy" holding, that reasoning is no longer applicable.

We leave these remaining questions for determination by the Court of Appeals on remand. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE WHITE and JUSTICE MARSHALL join, dissenting.

Section 1 of the Sherman Act provides in part: *"Every* contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U. S. C. § 1 (emphasis added). Although we have previously recognized that a completely literal interpretation of the word "every" cannot have been intended by Congress,[1] the Court today carries this recognition to an extreme by deciding that agreements between municipalities, or their officials, and private parties to use the zoning power to confer exclusive privileges in a particular line of commerce are beyond the reach of § 1. History, tradition, and the facts of this case all demonstrate that the Court's attempt to create a "better" and less inclusive Sherman Act, cf. *West Virginia*

---

[1] Construing the statute in the light of the common law concerning contracts in restraint of trade, we have concluded that only unreasonable restraints are prohibited.

"One problem presented by the language of § 1 of the Sherman Act is that it cannot mean what it says. The statute says that 'every' contract that restrains trade is unlawful. But, as Mr. Justice Brandeis perceptively noted, restraint is the very essence of every contract; read literally, § 1 would outlaw the entire body of private contract law. Yet it is that body of law that establishes the enforceability of commercial agreements and enables competitive markets — indeed, a competitive economy — to function effectively.

"Congress, however, did not intend the text of the Sherman Act to delineate the full meaning of the statute or its application in concrete situations. The legislative history makes it perfectly clear that it expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition. The Rule of Reason, with its origins in common-law precedents long antedating the Sherman Act, has served that purpose. . . . [The Rule of Reason] focuses directly on the challenged restraint's impact on competitive conditions." *National Society of Professional Engineers* v. *United States,* 435 U. S. 679, 687–688 (1978) (footnotes omitted).

We have also confined the Sherman Act's mandate by holding that the independent actions of the sovereign States and their officials are not covered by the language of the Act. *Parker* v. *Brown,* 317 U. S. 341 (1943).

*University Hospitals, Inc.* v. *Casey*, 499 U. S. 83, 101 (1991), is ill advised.

## I

As a preface to a consideration of the "state action" and so-called *"Noerr-Pennington"* exemptions to the Sherman Act, it is appropriate to remind the Court that one of the classic common-law examples of a prohibited contract in restraint of trade involved an agreement between a public official and a private party. The public official—the Queen of England—had granted one of her subjects a monopoly in the making, importation, and sale of playing cards in order to generate revenues for the crown. A competitor challenged the grant in *The Case of Monopolies*, 11 Co. Rep. 84, 77 Eng. Rep. 1260 (Q. B. 1602), and prevailed. Chief Justice Popham explained on behalf of the bench:

> "The Queen was . . . deceived in her grant; for the Queen . . . intended it to be for the weal public, and it will be employed for the private gain of the patentee, and for the prejudice of the weal public; moreover the Queen meant that the abuse should be taken away, which shall never be by this patent, but *potius* the abuse will be increased for the private benefit of the patentee, and therefore . . . this grant is void *jure Regio*." *Id.*, at 87a; 77 Eng. Rep., at 1264.

In the case before us today, respondent alleges that the city of Columbia, S. C., has entered into a comparable agreement to give the private petitioner a monopoly in the sale of billboard advertising. After a 3-week trial, a jury composed of citizens of the vicinage found that, despite the city fathers' denials, there was indeed such an agreement, presumably motivated in part by past favors in the form of political advertising, in part by friendship, and in part by the expectation of a beneficial future relationship—and in any case, not

exclusively by a concern for the general public interest.[2] Today the Court acknowledges the anticompetitive consequences of this and similar agreements but decides that they should be exempted from the coverage of the Sherman Act because it fears that enunciating a rule that allows the motivations of public officials to be probed may mean that innocent municipal officials may be harassed with baseless charges. The holding evidences an unfortunate lack of confidence in our judicial system and will foster the evils the Sherman Act was designed to eradicate.

## II

There is a distinction between economic regulation, on the one hand, and regulation designed to protect the public health, safety, and environment. In antitrust parlance a "regulated industry" is one in which decisions about prices and output are made not by individual firms, but rather by a public body or a collective process subject to governmental approval. Economic regulation of the motor carrier and airline industries was imposed by the Federal Government in the 1930's; the "deregulation" of those industries did not eliminate all the other types of regulation that continue to protect our safety and environmental concerns.

---

[2] The jury returned its verdict pursuant to the following instructions given by the District Court:

"So if by the evidence you find that that person involved in this case procured and brought about the passage of ordinances solely for the purpose of hindering, delaying or otherwise interfering with the access of the Plaintiff to the marketing area involved in this case . . . and thereby conspired, then, of course, their conduct would not be excused under the antitrust laws.

"So once again an entity may engage in . . . legitimate lobbying . . . to procure legislati[on] even if the motive behind the lobbying is anticompetitive.

"If you find Defendants conspired together with the intent to foreclose the Plaintiff from meaningful access to a legitimate decision making process with regard to the ordinances in question, then your verdict would be for the Plaintiff on that issue." App. 81.

The antitrust laws reflect a basic national policy favoring free markets over regulated markets.[3] In essence, the Sherman Act prohibits private unsupervised regulation of the prices and output of goods in the marketplace. That prohibition is inapplicable to specific industries which Congress has exempted from the antitrust laws and subjected to regulatory supervision over price and output decisions. Moreover, the so-called "state-action" exemption from the Sherman Act reflects the Court's understanding that Congress did not intend the statute to pre-empt a State's economic regulation of commerce within its own borders.

The contours of the state-action exemption are relatively well defined in our cases. Ever since our decision in *Olsen* v. *Smith*, 195 U. S. 332 (1904), which upheld a Texas statute fixing the rates charged by pilots operating in the Port of Galveston, it has been clear that a State's decision to displace competition with economic regulation is not prohibited by the Sherman Act. *Parker* v. *Brown*, 317 U. S. 341 (1943), the case most frequently identified with the state-action exemption, involved a decision by California to substitute sales quotas and price control—the purest form of economic regulation—for competition in the market for California raisins.

In *Olsen*, the State itself had made the relevant pricing decision. In *Parker*, the regulation of the marketing of Cali-

---

[3] "The Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services. 'The heart of our national economic policy long has been faith in the value of competition.' *Standard Oil Co.* v. *FTC*, 340 U. S. 231, 248 [(1951)]. The assumption that competition is the best method of allocating resources in a free market recognizes that all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers. Even assuming occasional exceptions to the presumed consequences of competition, the statutory policy precludes inquiry into the question whether competition is good or bad." *National Society of Professional Engineers*, 435 U. S., at 695.

fornia's 1940 crop of raisins was administered by state officials. Thus, when a state agency, or the State itself, engages in economic regulation, the Sherman Act is inapplicable. *Hoover* v. *Ronwin*, 466 U. S. 558, 568–569 (1984); *Bates* v. *State Bar of Arizona*, 433 U. S. 350, 360 (1977).

Underlying the Court's recognition of this state-action exemption has been respect for the fundamental principle of federalism. As we stated in *Parker*, 317 U. S., at 351: "In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress."

However, this Court recognized long ago that the deference due States within our federal system does not extend fully to conduct undertaken by municipalities. Rather, all sovereign authority "within the geographical limits of the United States" resides with "the Government of the United States, or [with] the States of the Union. There exist within the broad domain of sovereignty but these two. There may be cities, counties, and other organized bodies with limited legislative functions, but they are all derived from, or exist in, subordination to one or the other of these." *United States* v. *Kagama*, 118 U. S. 375, 379 (1886).

Unlike States, municipalities do not constitute bedrocks within our system of federalism. And also unlike States, municipalities are more apt to promote their narrow parochial interests "without regard to extraterritorial impact and regional efficiency." *Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389, 404 (1978); see also The Federalist No. 10 (J. Madison) (describing the greater tendency of smaller societies to promote oppressive and narrow interests above the common good). "If municipalities were free to make economic choices counseled solely by their own parochial inter-

ests and without regard to their anticompetitive effects, a serious chink in the armor of antitrust protection would be introduced at odds with the comprehensive national policy Congress established." *Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S., at 408. Indeed, "[i]n light of the serious economic dislocation which could result if cities were free to place their own parochial interests above the Nation's economic goals reflected in the antitrust laws, . . . we are especially unwilling to presume that Congress intended to exclude anticompetitive municipal action from their reach." *Id.*, at 412–413.[4]

Nevertheless, insofar as municipalities may serve to implement state policies, we have held that economic regulation administered by a municipality may also be exempt from Sherman Act coverage if it is enacted pursuant to a clearly articulated and affirmatively expressed state directive "to replace competition with regulation." *Hoover*, 466 U. S., at 569. However, the mere fact that a municipality acts within its delegated authority is not sufficient to exclude its anticompetitive behavior from the reach of the Sherman Act.

---

[4] In *Owen* v. *City of Independence*, 445 U. S. 622 (1980), this Court recognized that "notwithstanding [42 U. S. C.] § 1983's expansive language and the absence of any express incorporation of common-law immunities, we have, on several occasions, found that a tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that 'Congress would have specifically so provided had it wished to abolish the doctrine.' *Pierson* v. *Ray*, 386 U. S. 547, 555 (1967)." *Id.*, at 637. Nevertheless, the Court refused to find a firmly established immunity enjoyed by municipal corporations at common law for the torts of their agents. "Where the immunity claimed by the defendant was well established at common law at the time [42 U. S. C.] § 1983 was enacted, and where its rationale was compatible with the purposes of the Civil Rights Act, we have construed the statute to incorporate that immunity. But there is no tradition of immunity for municipal corporations, and neither history nor policy supports a construction of § 1983 that would justify" according them such immunity. *Id.*, at 638. See also *Will* v. *Michigan Dept. of State Police*, 491 U. S. 58, 70 (1989) ("States are protected by the Eleventh Amendment while municipalities are not . . .").

"Acceptance of such a proposition—that the general grant of power to enact ordinances necessarily implies state authorization to enact specific anticompetitive ordinances— would wholly eviscerate the concepts of 'clear articulation and affirmative expression' that our precedents require." *Community Communications Co.* v. *Boulder,* 455 U. S. 40, 56 (1982).

Accordingly, we have held that the critical decision to substitute economic regulation for competition is one that must be made by the State. That decision must be articulated with sufficient clarity to identify the industry in which the State intends that economic regulation shall replace competition. The terse statement of the reason why the municipality's actions in *Hallie* v. *Eau Claire,* 471 U. S. 34 (1985), was exempt from the Sherman Act illustrates the point: "They were taken pursuant to a clearly articulated state policy to replace competition in the provision of sewage services with regulation." *Id.,* at 47.[5]

---

[5] Contrary to the Court's reading of *Hallie,* our opinion in that case emphasized the industry-specific character of the Wisconsin legislation in explaining why the delegation satisfied the "clear articulation" requirement. At issue in *Hallie* was the town's independent decision to refuse to provide sewage treatment services to nearby towns—a decision that had been expressly authorized by the Wisconsin legislation. 471 U. S., at 41. We wrote:

"Applying the analysis of *Lafayette* v. *Louisiana Power & Light Co.,* 435 U. S. 389 (1978), it is sufficient that the statutes authorized the City to provide sewage services and also to determine the areas to be served." *Id.,* at 42.

"Nor do we agree with the Towns' contention that the statutes at issue here are neutral on state policy. The Towns attempt to liken the Wisconsin statutes to the Home Rule Amendment involved in *Boulder,* arguing that the Wisconsin statutes are neutral because they leave the City free to pursue either anticompetitive conduct or free-market competition in the field of sewage services. The analogy to the Home Rule Amendment involved in *Boulder* is inapposite. That Amendment to the Colorado Constitution allocated only the most general authority to municipalities to govern local affairs. We held that it was neutral and did not satisfy the 'clear

## III

Today the Court adopts a significant enlargement of the state-action exemption. The South Carolina statutes that confer zoning authority on municipalities in the State do not articulate any state policy to displace competition with economic regulation in any line of commerce or in any specific industry. As the Court notes, the state statutes were expressly adopted to promote the "'health, safety, morals or the general welfare of the community,'" see *ante*, at 370, n. 3. Like Colorado's grant of "home rule" powers to the city of Boulder, they are simply neutral on the question whether the municipality should displace competition with economic regulation in any industry. There is not even an arguable basis for concluding that the State authorized the city of Columbia to enter into exclusive agreements with any person, or to use the zoning power to protect favored citizens from competition.[6] Nevertheless, under the guise of acting

---

articulation' component of the state action test. The Amendment simply did not address the regulation of cable television. Under home rule the municipality was to be free to decide every aspect of policy relating to cable television, as well as policy relating to any other field of regulation of local concern. Here, in contrast, the State has specifically authorized Wisconsin cities to provide sewage services and has delegated to the cities the express authority to take action that foreseeably will result in anticompetitive effects. No reasonable argument can be made that these statutes are neutral in the same way that Colorado's Home Rule Amendment was." *Id.*, at 43.

We rejected the argument that the delegation was insufficient because it did not expressly mention the foreseeable anticompetitive consequences of the city of Eau Claire's conduct, but we surely did not hold that the mere fact that incidental anticompetitive consequences are foreseeable is sufficient to immunize otherwise unauthorized restrictive agreements between cities and private parties.

[6] The authority to regulate the "'location, height, bulk, number of stories and size of buildings and other structures,'" see *ante*, at 371, n. 3 (citation omitted), may of course have an indirect effect on the total output in the billboard industry, see *ante*, at 373–374, n. 4, as well as on a number of other industries, but the Court surely misreads our cases when it implies that a general grant of zoning power represents a clearly articulated deci-

pursuant to a state legislative grant to regulate health, safety, and welfare, the city of Columbia in this case enacted an ordinance that amounted to economic regulation of the billboard market; as the Court recognizes, the ordinance "obviously benefited COA, which already had its billboards in place . . . [and] severely hindered Omni's ability to compete." *Ante*, at 368.

Concededly, it is often difficult to differentiate economic regulation from municipal regulation of health, safety, and welfare. "Social and safety regulation have economic impacts, and economic regulation has social and safety effects." D. Hjelmfelt, Antitrust and Regulated Industries 3 (1985). It is nevertheless important to determine when purported general welfare regulation in fact constitutes economic regulation by its purpose and effect of displacing competition. "An example of economic regulation which is disguised by another stated purpose is the limitation of advertising by lawyers for the stated purpose of protecting the public from incompetent lawyers. Also, economic regulation posing as safety regulation is often encountered in the health care industry." *Id.*, at 3–4.

In this case, the jury found that the city's ordinance—ostensibly one promoting health, safety, and welfare—was in fact enacted pursuant to an agreement between city officials and a private party to restrict competition. In my opinion such a finding necessarily leads to the conclusion that the city's ordinance was fundamentally a form of economic regulation of the billboard market rather than a general welfare regulation having incidental anticompetitive effects. Because I believe our cases have wisely held that the decision to embark upon economic regulation is a nondelegable one that must expressly be made by the State in the context of a specific industry in order to qualify for state-action immunity, see, *e. g., Olsen* v. *Smith*, 195 U. S. 332 (1904) (Texas pilot-

sion to authorize municipalities to enter into agreements to displace competition in every industry that is affected by zoning regulation.

age statutes expressly regulated both entry and rates in the Port of Galveston); *Parker* v. *Brown*, 317 U. S. 341 (1943) (California statute expressly authorized the raisin market regulatory program), I would hold that the city of Columbia's economic regulation of the billboard market pursuant to a general state grant of zoning power is not exempt from antitrust scrutiny.[7]

Underlying the Court's reluctance to find the city of Columbia's enactment of the billboard ordinance pursuant to a private agreement to constitute unauthorized economic regulation is the Court's fear that subjecting the motivations and effects of municipal action to antitrust scrutiny will result in public decisions being "made subject to *ex post facto* judicial assessment of 'the public interest.'" *Ante*, at 377. That fear, in turn, rests on the assumption that "it is both inevitable and desirable that public officials often agree to do what one or another group of private citizens urges upon them." *Ante*, at 375.

The Court's assumption that an agreement between private parties and public officials is an "inevitable" precondition for official action, however, is simply wrong.[8] Indeed, I am

---

[7] A number of Courts of Appeals have held that a municipality which exercises its zoning power to further a private agreement to restrain trade is not entitled to state-action immunity. See, *e. g.*, *Westborough Mall, Inc.* v. *Cape Girardeau*, 693 F. 2d 733, 746 (CA8 1982) ("Even if zoning in general can be characterized as 'state action,' . . . a conspiracy to thwart normal zoning procedures and to directly injure the plaintiffs by illegally depriving them of their property is not in furtherance of any clearly articulated state policy"); *Whitworth* v. *Perkins*, 559 F. 2d 378, 379 (CA5 1977) ("The mere presence of the zoning ordinance does not necessarily insulate the defendants from antitrust liability where, as here, the plaintiff asserts that the enactment of the ordinance was itself a part of the alleged conspiracy to restrain trade").

[8] No such agreement was involved in *Hallie* v. *Eau Claire*, 471 U. S. 34 (1985). In that case the plaintiffs challenged independent action—the determination of the service area of the city's sewage system—that had been expressly authorized by Wisconsin legislation. The absence of any such agreement provided the basis for our decision in *Fisher* v. *Berkeley*,

persuaded that such agreements are the exception rather than the rule, and that they are, and should be, disfavored. The mere fact that an official body adopts a position that is advocated by a private lobbyist is plainly not sufficient to establish an agreement to do so. See *Fisher* v. *Berkeley*, 475 U. S. 260, 266–267 (1986); cf. *Theatre Enterprises, Inc.* v. *Paramount Film Distributing Corp.*, 346 U. S. 537, 541 (1954). Nevertheless, in many circumstances, it would seem reasonable to infer—as the jury did in this case—that the official action is the product of an agreement intended to elevate particular private interests over the general good.

In this case, the city took two separate actions that protected the local monopolist from threatened competition. It first declared a moratorium on any new billboard construction, despite the city attorney's advice that the city had no power to do so. When the moratorium was invalidated in state-court litigation, it was replaced with an apparently valid ordinance that clearly had the effect of creating formidable barriers to entry in the billboard market. Throughout the city's decisionmaking process in enacting the various ordinances, undisputed evidence demonstrated that Columbia Outdoor Advertising, Inc., had met with city officials privately as well as publicly. As the Court of Appeals noted: "Implicit in the jury verdict was a finding that the city was not acting pursuant to the direction or purposes of the South Carolina statutes but conspired solely to further COA's commercial purposes to the detriment of competition in the billboard industry." 891 F. 2d 1127, 1133 (CA4 1989).

Judges who are closer to the trial process than we are do not share the Court's fear that juries are not capable of recognizing the difference between independent municipal action and action taken for the sole purpose of carrying out an

---

475 U. S. 260, 266–267 (1986) ("The distinction between unilateral and concerted action is critical here. . . . Thus, if the Berkeley Ordinance stabilizes rents without this element of concerted action, the program it establishes cannot run afoul of § 1").

anticompetitive agreement for the private party.[9]   See, e. g., *In re Japanese Electronic Products Antitrust Litigation*, 631 F. 2d 1069, 1079 (CA3 1980) ("The law presumes that a jury will find facts and reach a verdict by rational means.   It does not contemplate scientific precision but does contemplate a resolution of each issue on the basis of a fair and reasonable assessment of the evidence and a fair and reasonable application of the relevant legal rules").   Indeed, the problems inherent in determining whether the actions of municipal officials are the product of an illegal agreement are substantially the same as those arising in cases in which the actions of business executives are subjected to antitrust scrutiny.[10]

---

[9] The instructions in this case, fairly read, told the jury that the plaintiff should not prevail unless the ordinance was enacted for the sole purpose of interfering with access to the market.   See n. 2, *supra*.   Thus, this case is an example of one of the "polar extremes," see *ante*, at 375, n. 5, that juries — as well as Solomon — can readily identify.   The mixed motive cases that concern the Court should present no problem if juries are given instructions comparable to those given below.   When the Court describes my position as assuming that municipal action that was not prompted "exclusively by a concern for the general public interest" is enough to create antitrust liability, *ibid.*, it simply ignores the requirement that the plaintiff must prov.e that the municipal action is the product of an anticompetitive agreement with private parties.   Contrary to our square holding in *Fisher* v. *Berkeley*, 475 U. S. 260 (1986), today the Court seems to assume that municipal action which is not entirely immune from antitrust scrutiny will automatically violate the antitrust laws.

[10] "There are many obstacles to discovering conspiracies, but the most frequent difficulties are three.   First, price-fixers and similar miscreants seldom admit their conspiracy or agree in the open.   Often, we can infer the agreement only from their behavior.   Second, behavior can sometimes be coordinated without any communication or other observable and reprehensible behavior.   Third, the causal connection between an observable, controllable act — such as a solicitation or meeting — and subsequent parallel action may be obscure."   6 P. Areeda, Antitrust Law ¶ 1400, at 3–4 (1986).   See also Turner, The Definition of Agreement under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv. L. Rev. 655 (1962)

The difficulty of proving whether an agreement motivated a course of conduct should not in itself intimidate this Court into exempting those illegal agreements that are proved by convincing evidence. Rather, the Court should, if it must, attempt to deal with these problems of proof as it has in the past—through heightened evidentiary standards rather than through judicial expansion of exemptions from the Sherman Act. See, *e. g., Matsushita Electric Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574 (1986) (allowing summary judgment where a predatory pricing conspiracy in violation of the Sherman Act was founded largely upon circumstantial evidence); *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U. S. 752, 768 (1984) (holding that a plaintiff in a vertical price-fixing case must produce evidence which "tends to exclude the possibility of independent action").

Unfortunately, the Court's decision today converts what should be nothing more than an anticompetitive agreement undertaken by a municipality that enjoys no special status in our federalist system into a lawful exercise of public decision-making. Although the Court correctly applies principles of federalism in refusing to find a "conspiracy exception" to the *Parker* state-action doctrine when a State acts in a nonproprietary capacity, it errs in extending the state-action exemption to municipalities that enter into private anticompetitive agreements under the guise of acting pursuant to a general state grant of authority to regulate health, safety, and welfare. Unlike the previous limitations this Court has imposed on Congress' sweeping mandate in § 1, which found support in our common-law traditions or our system of federalism, see n. 1, *supra*, the Court's wholesale exemption of municipal action from antitrust scrutiny amounts to little more than a bold and disturbing act of judicial legislation

(discussing difficulties of condemning parallel anticompetitive action absent explicit agreement among the parties).

which dramatically curtails the statutory prohibition against "every" contract in restraint of trade.[11]

## IV

Just as I am convinced that municipal "lawmaking that has been infected by selfishly motivated agreement with private interests," *ante,* at 383, is not authorized by a grant of zoning authority, and therefore not within the state-action exemption, so am I persuaded that a private party's agreement with selfishly motivated public officials is sufficient to remove the antitrust immunity that protects private lobbying under *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.,* 365 U. S. 127 (1961), and *Mine Workers* v. *Pennington,* 381 U. S. 657 (1965). Although I agree that the "sham" exception to the *Noerr-Pennington* rule exempting lobbying activities from the antitrust laws does not apply to the private petitioner's conduct in this case for the reasons stated by the Court in Part III of its opinion, I am satisfied that the evidence in the record is sufficient to support the jury's finding that a conspiracy existed between the private party and the municipal officials in this case so as to remove the private petitioner's conduct from the scope of *Noerr-Pennington* antitrust immunity. Accordingly, I would af-

---

[11] As the Court previously has noted:

"In 1972, there were 62,437 different units of local government in this country. Of this number 23,885 were special districts which had a defined goal or goals for the provision of one or several services, while the remaining 38,552 represented the number of counties, municipalities, and townships, most of which have broad authority for general governance subject to limitations in one way or another imposed by the State. These units may, and do, participate in and affect the economic life of this Nation in a great number and variety of ways. When these bodies act as owners and providers of services, they are fully capable of aggrandizing other economic units with which they interrelate, with the potential of serious distortion of the rational and efficient allocation of resources, and the efficiency of free markets which the regime of competition embodied in the antitrust laws is thought to engender." *Lafayette* v. *Louisiana Power & Light Co.,* 435 U. S. 389, 407–408 (1978) (footnotes omitted).

firm the judgment of the Court of Appeals as to both the city of Columbia and Columbia Outdoor Advertising, Inc.

I respectfully dissent.