WILLIS–KNIGHTON MEDICAL
CENTER

v.

CITY OF BOSSIER, CITY,
LOUISIANA, et al.

No. CIV. A. 96–2617.

United States District Court,
W.D. Louisiana,
Shreveport Division.

Oct. 15, 1997.

James Charles McMichael, Jr., Blanchard Walker O'Quin & Roberts, Shreveport, LA, for Plaintiff.

James D. Hall, City Attorney's Office, City of Bossier City, Bossier City, LA, for City of Bossier City.

Bernard S. Johnson, Kenneth Mascagni, Cook Yancey King & Galloway, Shreveport, LA, for Bossier City Medical Center, Carter J. Boyd, M.D., Charles A. Powers, M.D.

Thomas A. Wilson, Jr., Bossier City, LA, for Robert Campbell.

### *JUDGMENT*

STAGG, District Judge.

For the reasons stated in the Report and Recommendation of the Magistrate Judge previously filed herein, having thoroughly reviewed the record and the objections of the parties, and concurring with the Magistrate Judge's findings under the applicable law;

IT IS ORDERED that the defendants' motion to dismiss pursuant to Rule 12(b)(6) is GRANTED; that plaintiff's Sherman Act claims against all defendants are DISMISSED WITH PREJUDICE, and that plaintiff's claims under La. R.S. 51:1401, et seq., are DISMISSED WITHOUT PREJUDICE.

### *REPORT AND RECOMMENDATION*

PAYNE, United States Magistrate Judge.

Plaintiff Willis–Knighton Medical Center ("Willis–Knighton") instituted this federal antitrust action against defendants the City of Bossier City, Louisiana ("the City"), Bossier Medical Center ("Bossier Medical"), Carter J. Boyd, M.D., Charles Campbell, M.D. and Charles A. Powers, M.D. Willis–Knighton's complaint alleges that the defendants have engaged in anti-competitive conduct in violation of the Sherman Act, 15 U.S.C. § 1, et seq., as well as the Louisiana Unfair Trade Practices Law, La. R.S. 51:1401, et seq.

844

Contending that they are immune from antitrust liability for the challenged conduct under the doctrine of "state action" immunity, the defendants have filed a motion to dismiss pursuant to Rule 12(b)(6). For the following reasons, it is recommended that the motion be granted, and that plaintiff's action be dismissed.

## BACKGROUND

### Factual Allegations

A complaint should survive scrutiny under Rule 12(b)(6) unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). For purposes of the motion, plaintiff's factual allegations must be taken as true and construed in the light most favorable to him. *Green v. State Bar of Texas*, 27 F.3d 1083 (5th Cir.1994); *Rathborne v. Rathborne*, 683 F.2d 914, 917 n. 8 (5th Cir.1982). It is not required that the complaint outline all the elements of a claim; it is sufficient if inferences may be drawn that these elements exist. *Walker v. South Central Bell*, 904 F.2d 275 (5th Cir.1990). With this standard in mind, the following factual allegations in the complaint are accepted as true for the purposes of resolving the motion to dismiss.

Defendant Bossier Medical is a hospital in Bossier City which provides primary and secondary inpatient and outpatient care. Since 1966, Bossier Medical has been owned and operated by the City. In July, 1996, plaintiff Willis–Knighton opened WK Bossier Health Center in Bossier City, a hospital which provides basically the same range of medical services as Bossier Medical. The two hospitals compete for the provision of medical services in the Bossier area.[1] Willis–Knighton contends that the defendants have engaged and continue to engage in acts or practices "specifically designed to financially harm" WK Bossier Health Center. (Complaint at 5). The complaint describes particular examples of anticompetitive conduct, which appear to fall into three basic categories. First, Bossier Medical, with the ap-

proval of the City, has allegedly entered into long term and inflated "employment" contracts with the defendant physicians, which require the defendant physicians to refer all their patients to Bossier Medical and preclude them from practicing at WK Bossier Health Center. Bossier Medical, with the approval of the City, has also allegedly entered into inflated practice and asset purchase contracts in order to require exclusive referrals and admissions to Bossier Medical from those physicians. The terms of these contracts are such that Bossier Medical agreed to pay more than the fair market value of the underlying assets. This category of alleged anticompetitive conduct will be generically described as "the contract claims."

Second, Bossier Medical has allegedly adopted emergency room referral policies and protocols designed to circumvent call rotation schedules and to prevent admissions to WK Bossier Health Center and referrals to physicians who have rented offices in the medical offices building at that facility. These policies provide financial penalties for Bossier Medical physicians who admit patients to WK Bossier Health Center or who refer patients to that facility. We will refer to this category as "the physician penalty claims."

Third, Willis–Knighton contends that Bossier Medical has routinely directed patients away from physicians affiliated with WK Bossier Health Center through the dissemination of false and misleading information. It is also alleged that Bossier Medical, through its administrators and officials of the City, has made false and malicious public statements about the plaintiff and WK Bossier Health Center in order to damage their reputations and business ("the misrepresentation claims").

### Claims Asserted and Relief Sought

Based on the foregoing factual allegations, Willis–Knighton asserts that the defendants entered into a contract, combination and conspiracy to restrain trade in the provision of

---

1. In reciting the facts, we make no attempt to resolve any dispute that exists between the parties as to the size of the relevant market for purposes of analyzing whether there has been an antitrust injury.

primary and secondary inpatient and outpatient hospital care in Bossier City in violation of Section 1 of the Sherman Act. Plaintiff also alleges that the same conduct by the defendants constitutes a conspiracy to monopolize hospital care in violation of Section 2 of the Sherman Act, as well an unlawful attempted monopolization in violation of that statute. Finally, plaintiff contends that the defendants' conduct rises to the level of unfair or deceptive practices that are in violation of the Louisiana Unfair Trade Practices Law, La. R.S. 51:1401, et seq. Willis–Knighton seeks injunctive relief against all defendants on the antitrust claims, and monetary damages and injunctive relief on its state law unfair trade practices claims.

## ANALYSIS

### Municipalities and State Action Immunity

In *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the United States Supreme Court held that the Sherman Act does not apply to anticompetitive restraints imposed by the States "as an act of government." *Id.*, 317 U.S. at 352, 63 S.Ct. at 314. Relying on principles of federalism and state sovereignty, the Supreme Court concluded that the Sherman Act was intended to prohibit *private* restraints on trade, but not a state's control over its officers and agents in activities directed by the legislature. *Id.*, at 351, 63 S.Ct. at 313.

Because municipalities are not themselves sovereign, they are not beyond the reach of antitrust laws and have no per se right to invoke state action immunity. *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 412, 98 S.Ct. 1123, 1136, 55 L.Ed.2d 364 (1978). Nevertheless, they are entitled to immunity under the state action doctrine when two requirements are satisfied. First, the challenged activity must be undertaken pursuant to a state policy that is "clearly articulated and affirmatively expressed." *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 39, 105 S.Ct. 1713, 1716, 85 L.Ed.2d 24 (1985), *citing Lafayette*, 435 U.S. at 410, 98 S.Ct. at 1135. Second, the challenged anticompetitive conduct must be a foreseeable result of the state policy. 471 U.S. at 43–44, 105 S.Ct. at 1719. In order to establish that anticompetitive consequences are foreseeable, the municipality is not required "to point to a specific detailed legislative authorization" for the challenged anticompetitive conduct. *Lafayette*, 435 U.S. at 415, 98 S.Ct. at 1138. Nor must there be an express statement, in a state statute or its legislative history, that the state legislature intends for the delegated action to have anticompetitive effects. *Hallie*, 471 U.S. at 43–44, 105 S.Ct. at 1719. The municipality may prevail with a state action defense simply by establishing that "anticompetitive effects logically would result" from the municipality's exercise of the authority granted by the state. *Id.* 471 U.S. at 42, 105 S.Ct. at 1718. The dispositive inquiry is whether the challenged anticompetitive conduct is a "foreseeable result" of the conduct authorized by the state statute. *Id.; City of Columbia v. Omni Outdoor Advertising*, 499 U.S. 365, 372–73, 111 S.Ct. 1344, 1350, 113 L.Ed.2d 382 (1991).

The application of the foreseeability test is illustrated by the Supreme Court's decisions in *Hallie* and *Columbia*. In *Hallie*, the municipality was sued under the Sherman Act because it had refused to provide sewerage treatment services to adjacent unincorporated townships unless a majority of the individuals in an area desiring service voted by referendum election to have their homes annexed by the City. The pertinent state statutes authorized cities to construct sewage systems, to provide service for such systems and to fix by ordinance the limits of any service to be provided in unincorporated areas. The statute further provided that a municipality would be under no obligation to provide service beyond the areas so delineated. Contending that the state action doctrine did not apply, the plaintiffs argued that state statutes which merely authorized provision of sewage services to unincorporated areas could not be reasonably construed as authorizing anticompetitive conduct. They characterized the statutes as "neutral," rather than as a grant of power that reflected an intention to displace competition. The Supreme Court rejected these arguments, finding that the City's anticompetitive conduct "is a foreseeable result of empowering the City to refuse to serve unannexed areas." 471 U.S. at 42, 105 S.Ct. at 1718. According-

ly, the Court held that the municipality was entitled to state action immunity.

In *Columbia,* the municipality adopted an ordinance regulating the size, location and spacing of billboards. The plaintiff, a billboard company new to the area market, alleged that the ordinance suppressed competition by enhancing the market position of another billboard company that had done business in the community for years without competition, and that had longstanding connections with members of city government. The ordinance was enacted pursuant to the authority of a state statute which generally authorized municipalities to regulate the height and size of "buildings and other structures." The Supreme Court concluded that it was foreseeable that municipalities acting under the authority of that ordinance would adopt zoning ordinances that would prevent normal acts of competition, particularly on the part of new market entrants. Therefore, the antitrust claims against the municipality were dismissed.

### *Application of the State Action Doctrine in This Case*

### The Statutory Scheme

■ In urging their entitlement to state action immunity, the defendants rely on certain statutory provisions concerning hospital service districts. Before attempting to apply the state action doctrine to the facts alleged, it is important to determine which statutory provisions apply to Bossier Medical, an issue on which the parties are not entirely in agreement.

Chapter 10 of Title 46 of the Louisiana Revised Statutes is entitled "Hospital Service Districts." Part I of Chapter 10 (§§ 1051–1068.1) contains general provisions for the creation and operation of hospital service districts, which are described as entities that may be created by the police juries of one or more parishes and that are to be governed by appointed commissioners. As Bossier Medical is a municipal hospital, rather than a hospital created at the parish level, the parties agree that the provisions of §§ 1051–1068.1 do not apply to Bossier Medical.

Part II of Chapter 10, entitled "Competition," is comprised of La. R.S. 46:1071–1077. Subpart A of Part II, entitled "Enhanced

Ability to Compete," is comprised of §§ 1071–1076 (enacted by Acts 1984, No. 322, § 1), and Subpart B, entitled "Contracts or Joint Ventures," is comprised of § 1077 (enacted by Acts 1985, No. 125, § 1). For the purposes of Subpart A (§§ 1071–1076), the definition of hospital service district includes both a hospital formed by a parish government and governed by a commission, as authorized by La. R.S. 46:1051, and a hospital owned by a city, parish, or other political subdivision of the state. The parties agree that based on the latter part of this definition, the provisions of §§ 1071–1076 pertain to Bossier Medical. The disagreement is over the applicability of Subpart B, § 1077, which does not separately define the term hospital service district, or incorporate by reference the definition contained in Subpart A. Whether § 1077 applies to Bossier Medical is potentially critical to the outcome of the state action immunity issue, since the defendants rely heavily on the contracting authority granted to hospital service districts by that statute in urging their immunity defense.

Willis–Knighton argues that the § 1072's definition of hospital service districts, which includes hospitals owned by municipalities, is limited by its express terms to the statutes contained "in this Subpart," i.e., Subpart A, §§ 1071–1076. Thus, it contends that § 1077, which is in Subpart B, is not governed by the Subpart A definition, and that the reference to hospital service districts in § 1077 refers only to districts created at the parish level, as authorized by §§ 1051–1068.1. We reject this argument for three reasons. First, it is noteworthy that in 1995, the Louisiana Legislature made minor amendments to § 1072 and § 1077 through the vehicle of one legislative act, Acts 1995, No. 1074, § 1. The inclusion of amendments to both statutes in the same act supports the conclusion that the definitions contained in § 1072 apply to § 1077. Secondly, there is no logical reason why this would not be the case, i.e., why the legislature would enact a statute regarding contracting authority that applies to some hospital service districts, but not others. Third, the Louisiana Attorney General has issued an opinion which states that a municipal hospital is vested with any

benefits and powers conferred upon hospital service districts by §§ 1071–1077. Op.-Atty. Gen. No. 96–117, March 26, 1996. While a technical amendment of § 1072 for the purpose of clarifying that it applies to both Subparts would remove any ambiguity that does exist as to the issue, we conclude for the reasons stated that § 1077 applies to municipally owned hospitals such as Bossier Medical.

■ Having determined that §§ 1071–1077 are applicable, we turn to the pertinent provisions of those statutes. Section 1071 provides the following statement of purpose:

> The legislature hereby finds that the market for hospital and health care services is becoming increasingly competitive. The legislature finds that the hospital and other health care providers are contracting to engage in economic joint ventures or form partnerships to offer integrated health care services to the public. The legislature finds that this increasing competition is forcing hospitals and other health care providers to develop market strategies and strategic plans to effectively compete. The legislature further finds that hospital service districts are presently at a competitive disadvantage. The legislature hereby declares that the purpose of R.S. 46:1071 through 1076 is to enhance the· ability of a hospital service district to compete effectively and equally in the market for health care services. Towards this end, the provisions of R.S. 46:1071 through 1076 shall be construed liberally.

Section 1073 authorizes hospital service districts to "develop marketing strategies for its existing hospital health services or any hospital health service to be provided in the future" and to "develop strategic plans for the development of any future hospital health service or facility." Section 1074 empowers hospital service districts to acquire, construct, lease and maintain medical office buildings and facilities, and Section 1075 authorizes such districts to advertise their services in any medium. Finally, Section 1077 provides in pertinent part that:

> ...a hospital service district...may contract with or engage in a joint venture with any person, corporation, partnership, or group of persons to offer, provide, promote, establish, or sell any hospital health service.

## Antitrust Impact of the Statutory Scheme

The defendants argue that based on the foregoing statutory provisions, it is readily foreseeable that a municipal hospital will engage in the kind of anticompetitive conduct at issue in this case. In particular, they contend that the fact that § 1077 authorizes public hospitals to enter contracts makes it foreseeable that such hospitals will enter exclusive service contracts that have anticompetitive effects. The fact that the statutes also authorize such hospitals to engage in the development of marketing strategies and strategic plans, defendants contend, renders it foreseeable that the hospitals will engage in business strategies that have anticompetitive effects.

In support of their position, the defendants rely heavily on *Martin v. Memorial Hospital at Gulfport,* 86 F.3d 1391 (5th Cir.1996), a Sherman Act case in which the Fifth Circuit held that the district court erred by refusing to grant summary judgment in favor of a municipal hospital on the basis of state action immunity. In *Martin,* the challenged anticompetitive conduct involved an exclusive services contract between the hospital and a physician for the operation of the hospital's facility for end stage renal disease. ·The Fifth Circuit's holding was based in part on a state statute authorizing municipal hospitals "to contract with any individual for the providing of services by or to the community hospital regarding any facet of the operation of the hospital...." *Id.* 86 F.3d at 1399. The Court of Appeals concluded that "[t]he hospital's allegedly anticompetitive conduct could have been reasonably anticipated by the Mississippi Legislature when it gave the hospital the power to enter a contract with an individual physician to operate any aspect, division or department of its operation." *Id.* at 1400.

Willis–Knighton counters that the stated purpose of the Louisiana statutory scheme is to place public hospitals *on equal footing* in the competitive market with privately owned hospitals, as opposed to giving them special advantages by allowing them to engage in

anticompetitive conduct otherwise prohibited by antitrust laws. (Plaintiff's *Memorandum in Opposition* at 9–10). Plaintiff argues that the rights and powers delegated by §§ 1071–1077 neither expressly nor impliedly reflect a legislative intention to displace unfettered competition, but simply an intention to allow such hospitals to compete in the market in the same manner as private hospitals. Plaintiff also argues that *Martin* is not controlling because the Fifth Circuit's decision in that case was not based solely on a state statute authorizing public hospitals to enter contracts, but also on a separate statute requiring hospitals to obtain a certificate of need before operating an end stage renal disease facility.

Plaintiff's arguments regarding legislative intent in the enactment of §§ 1071–77—to equalize, rather than to supplant, competition between public and private hospitals—have a certain amount of persuasive appeal. Various provisions in these statutes seem designed to remove impediments to competition on the part of public hospitals by stipulating that certain laws normally applicable to state agencies do not apply to such hospitals. For example, § 1073(B) permits a hospital service district commission to discuss marketing strategies in executive session, thereby removing such sessions from the purview of open meetings laws that otherwise apply to state agencies. Section 1073(C) similarly provides that records prepared on marketing strategy shall not be considered public records subject to disclosure under R.S. 44:1, et seq. Section 1074 provides that the provisions of R.S. 41:1211, et seq., restricting leases of public property, do not prohibit a hospital service district from leasing medical office buildings in the manner authorized therein. Certain provisions of Section 1077, which stipulate that a joint venture between a public hospital and another entity for the provision of health care services shall be deemed a "cooperative endeavor," and that any contract executed pursuant to the statute shall be presumed to be for the purpose of obtaining a tangible asset, are designed to assure that such activities will not be considered a violation of the restrictions on the use and donation of state property contained in Article VII, Section 14 of the Louisiana Constitution of 1974. These provisions, together with the wording of § 1071, indicate that the primary purpose of these statutes is to level the competitive playing field between public and private hospitals.

Nevertheless, the Supreme Court's decisions in *Hallie* and *Columbia*, as well the Fifth Circuit's recent application of those precedents to a public hospital in *Martin*, do not require the municipality to establish that the primary purpose of the state statutes is displacement of competition. The proper inquiry is whether in light of the conduct authorized by the statute, anticompetitive conduct is foreseeable. *See also Independent Taxicab Drivers' Employees v. Greater Houston Transportation Co.*, 760 F.2d 607 (5th Cir.), *cert. denied*, 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985) (city's grant of exclusive taxi franchise foreseeable in light of state statutes authorizing regulation of taxi fares and authorizing municipalities to enter contracts for provisions of goods and services to airports); *Helen Brett Enterprises v. New Orleans Metropolitan Convention and Visitors Bureau, Inc.*, 1996 WL 346314 (E.D.La.1996) (municipal authority's decision to tie advance bookings at convention center to booking of a minimum number of hotel rooms foreseeable in light of statutes authorizing municipal authority to enter contracts and "to make and enforce rules and regulations" regarding operation of convention center).

*Martin* expressly holds that a legislative delegation of authority to contract renders it foreseeable that a municipal hospital will enter exclusive, anticompetitive contracts. This holding controls the disposition of plaintiff's contract claims, and mandates a determination that those claims are precluded by the immunity doctrine. The physician penalty claims, which involve emergency room referral policies and procedures, are also a foreseeable consequence of the statutory authorization for public hospitals to engage in marketing and strategic planning (§ 1073). To the extent that Bossier Medical has allegedly prohibited referrals to physicians located at WK Bossier Health Center, such conduct is also a foreseeable consequence of the provisions which authorize public hospitals to operate and lease medical

office buildings (§ 1074). Finally, as regards the misrepresentation claims, it is foreseeable that the competitive conduct authorized by the referenced statutes, including the power to advertise in any medium, would result in a public hospital or its officials making statements which criticize a competitor—fairly or unfairly. Thus, to the extent that such conduct has anticompetitive consequences, any *antitrust claims* based on that conduct are also encompassed by the immunity doctrine.[2]

As noted above, plaintiff argues that *Martin* is distinguishable because the Fifth Circuit relied both on a statute granting public hospitals the authority to enter contracts and a statute which required such hospitals to obtain a certificate of need in order to provide the services in question. Based on the language and tenor of *Martin,* this court concludes that the Court of Appeals viewed each of the referenced statutes as an independent basis for applying state action immunity. In other words, the delegation of contractual authority, standing alone, was enough to immunize the municipal hospital from any antitrust liability that might otherwise arise from executing an exclusive services contract. Furthermore, it is worth noting that neither of the statutes which supplied the basis for immunity in *Martin* (the statute authorizing the entering of contracts and the statute requiring a certificate of need) appears to have had as its *primary purpose* the displacement of competition. Nevertheless, the municipality was entitled to immunity because anticompetitive conduct was a *natural consequence* of the statutory regulation. Application of *Martin,* and the Supreme Court precedent on which it is based, requires the same result in this case.[3]

Applied in this fashion, the scope of foreseeability test is quite broad. It arguably allows a municipality to engage in anticompetitive conduct in any area in which municipalities are authorized by the Legislature to enter contracts, or to otherwise participate as players in the private market.[4] Conceivably this approach, in some cases, will become a self-fulfilling prophecy, i.e., (1) a municipality's anticompetitive conduct is immune if a grant of statutory authority makes such conduct foreseeable; (2) a municipality can ordinarily be expected to seek any advantages it can obtain from anticompetitive conduct if it knows that it is immune from antitrust liability; and therefore (3) anticompetitive conduct on the part of the municipality is foreseeable. Whether or not the foreseeability test will operate in

---

2. Whether misrepresentations in this context give rise to viable state law tort claims is not considered. Also not considered is the defendants' alternative contention that plaintiff's allegations regarding the alleged misrepresentations do not state an antitrust claim even in the absence of immunity because they are conclusory in nature and do not establish that there was an injury to the relevant market.

3. In its opposition memorandum, Willis–Knighton asserts that the immunity doctrine does not apply unless the state statutory scheme evidences a "'clearly articulated and affirmatively expressed state policy' to displace competition with regulation or monopoly public service." Plaintiff's Memorandum in Opposition at 4. However, a careful reading of the controlling jurisprudence reflects that what must be "clearly articulated and affirmatively expressed" is a state policy delegating certain authority to municipalities, from which an intention to displace competition is presumed if anticompetitive consequences are a foreseeable result of the statutes or regulations. As the Supreme Court held in *Columbia,* "[w]e have rejected the notion that the [clear articulation] requirement can be met only if the delegating statute explicitly permits displacement of

competition. It is enough, we have held, if the suppression of competition is the 'foreseeable result' of what the state authorized." 499 U.S. at 372–73, 111 S.Ct. at 1350.

4. This is not to say that any legislative delegation of authority to municipalities, no matter how broadly worded, will immunize all municipal actions taken under the authority of that delegation. For example, in *Community Communications Co. v. Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), a state constitutional amendment granting general authority to municipalities to govern their affairs was held insufficient to immunize a municipality's conduct in connection with the regulation of cable television. But when the state statutory scheme expresses a clear policy with regard to an identifiable subject matter (e.g., provision of sewerage treatment services; authority to regulate size and placement of structures; operation of public hospitals), it is difficult to envision many situations in which the immunity doctrine will not apply. As one commentator has noted, "[i]t would take a fairly extreme situation to find antitrust liability [of a municipality] under *Columbia,* and even then there are doubts." H. Hovenkamp, Federal Antitrust Policy § 20.6, at 687–88 (1994).

this fashion in some cases, or whether a market participant exception to the immunity doctrine might eventually be recognized for certain commercial activities, *see generally Helen Brett Enterprises,* 1996 WL 346314 at *4, the current state of the jurisprudence compels a finding that the City and Bossier Medical are entitled to antitrust immunity in this case.

### Antitrust Claims Against the Individual Defendants

Plaintiff argues that individual defendants are not entitled to the benefit of state action immunity unless, in addition to making the same showing required of a municipality, they also establish that their conduct was actively supervised by the state. *See Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). Contending that the physician defendants cannot make such a showing in this case, Willis–Knighton submits that even if its claims against the City and Bossier Medical are precluded by state action immunity, its claims against Drs. Boyd, Campbell and Powers are not.

 The defendants respond that the "active supervision" requirement articulated in *Southern Motor Carriers* and other cases only applies when the challenged anticompetitive conduct exclusively involves private parties. They contend that when private parties contract with municipalities, or otherwise engage in cooperative conduct with a municipality that is challenged as anticompetitive, the private defendants' entitlement to immunity is judged by the same standard applicable to the municipalities. These arguments have support in the jurisprudence. A private party is entitled to state action immunity, without the necessity of meeting the "active supervision" requirement, when (1) that party was engaged in cooperative conduct with a municipality for which the municipality is immune under the antitrust laws, and (2) the participation of private parties was reasonably contemplated by the state legislature. *Cine 42nd Street Theater Corp. v. Nederlander Org.,* 790 F.2d 1032, 1047–48 (2d Cir. 1986). To hold otherwise would allow plaintiffs to block the protected activities of the

municipality by suing the private parties. *Id. See also Helen Brett Enterprises, supra,* 1996 WL 346314 at *6–7. In this case, the statutory scheme expressly contemplates that municipal hospitals will enter contracts with private parties. Since the municipality is immune from antitrust liability in connection with such conduct, immunity is extended to the individual physicians as well.[5]

### State Unfair Trade Practices Claims

Given the recommended dismissal of all federal claims at this early stage of the proceedings, and the absence of a basis for diversity jurisdiction, the appropriate disposition of plaintiff's claims under the Louisiana Unfair Trade Practices Law, La. R.S. 51:1401, et seq., is dismissal without prejudice. 28 U.S.C. § 1367(c)(3).

Accordingly, **IT IS RECOMMENDED** that the defendants' motion to dismiss pursuant to Rule 12(b)(6) be **GRANTED;** that plaintiff's Sherman Act claims against all defendants be **DISMISSED WITH PREJUDICE,** and that plaintiff's claims under La. R.S. 51:1401, et seq., be **DISMISSED WITHOUT PREJUDICE.**

#### *Objections*

Under the provisions of 28 U.S.C. section 636(B)(1)(C), and Fed.R.Civ. Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed.R.Civ.P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See

---

5. Having reached this conclusion, we have no occasion to address the defendants' separate con-

tention that the physicians are entitled to immunity under the Noerr–Pennington doctrine.

*Douglass v. U.S.A.A.*, 79 F.3d 1415 (5th Cir. 1996) (en banc).